UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KATHLEEN POPE,

    **Plaintiff,**

    v.

THE KROGER CO.,

    **Defendant.**

Case No. 1:19-cv-817
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

Plaintiff Kathleen Pope ("Pope") went to a grocery store operated by Defendant, The Kroger Co. ("Kroger") intending to buy "raw" honey, but claims she instead got a raw deal. According to Pope, the honey in the bottle labeled "raw" honey was not in fact "raw," and she now brings a putative class action seeking to represent other Kroger "raw" honey purchasers, who, she claims, were likewise duped. The action is now before the Court on Kroger's Motion to Dismiss. (Doc. 11). For the reasons explained below, the Court **GRANTS** Kroger's Motion to Dismiss (Doc. 11) and **DISMISSES** Pope's Complaint (Doc. 1) **WITHOUT PREJUDICE**, but also *sua sponte* grants Pope twenty-eight (28) days' leave to amend her Complaint.

## BACKGROUND[1] AND PROCEDURAL HISTORY

Kroger is a national grocery store chain that operates under the names Kroger and Mariano's. (Compl., Doc. 1, ¶ 6, #2). Through these stores, it sells food products

---

[1] Because this is a motion to dismiss, the facts are taken from Pope's complaint and assumed to be true. *See Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015).

bearing others' brands (e.g., Kellogg's), and in addition sells at least two types of privately-branded goods: Private Selection and Simple Truth. (*Id.*). This lawsuit stems from two products that Kroger sells in its privately-branded lines: Kroger's Private Selection Raw and Unfiltered Wildflower Honey ("Private Selection Raw Honey") and Kroger's Simple Truth Organic Raw and Unfiltered Honey ("Simple Truth Raw Honey") (collectively the "Kroger Raw Honey Products").

More specifically, Pope claims she purchased a bottle of Private Selection Raw Honey from her local Mariano's store in Illinois (Mariano's is a name under which Kroger operates some grocery stores), but that the "raw" honey inside was anything but. (*See id.* at ¶ 38, #7). According to Pope, "raw honey" means honey that is not heated during processing. In particular, she maintains that any honey that has been heated to a temperature over 105 degrees Fahrenheit is no longer raw. (*See id.* at ¶¶ 11, 22, #3, 4). She claims that processors will heat honey to make it easier to process (as it flows better when heated), but that the heat denatures beneficial enzymes that are present in the honey when harvested. (*Id.* at ¶¶ 3, 11, #2, 3). Those enzymes, she claims, are what makes "raw" honey more healthful than processed honey, and thus what makes consumers willing to pay more for "raw" honey. (*See id.* at ¶¶ 3, 23, 41, #2, 4, 7).

Pope further alleges that one can ascertain whether honey was heated above 105 degrees Fahrenheit by testing the hydroxymethylfurfural ("HMF") value of the honey. (*Id.* at ¶ 13, #3). According to Pope, the "scientific community" has supposedly "long recognized" that HMF values over 40 mg/kg are "strong evidence that raw honey

2

was heated to a high enough temperature for a long enough period of time to break down the enzymes in the honey." (*Id.* at ¶ 15). To buttress this claim, she points to the Codex Alimentarius ("Codex"), which is allegedly recognized by the World Trade Organization as an "international reference standard" for resolving disputes about food safety. (*Id.* at ¶ 17, #4). She alleges that, under the Codex Alimentarius, the "international standard" requires that raw honey "must have [] a maximum HMF value of 40 mg/kg to ensure that the product has not undergone extensive heating." (*Id.* at ¶ 16).

Pope further claims that she had an independent laboratory (she does not say which one) test the bottle of Private Selection Raw Honey that she purchased, along with a bottle of Simple Truth Raw Honey (that she does not allege that she purchased). She claims that the testing revealed that the bottle of Private Selection Raw Honey had an HMF value of 100 mg/kg, (*id.* at ¶ 18), and that the bottle of Simple Truth Raw Honey had an HMF value of 99 mg/kg. (*Id.* at ¶ 19). Thus, the honey in the two bottles failed to meet the Codex "international standard," in turn meaning, according to Pope, that they were fraudulently labeled "raw."

Based on testing these two bottles, Pope asserts that (1) all of the Raw Honey Products Kroger sold must have similar HMF values, (*id.* at ¶¶ 42–46, #8); (2) these HMF values mean Kroger must have heated the honey to more than 105 degrees Fahrenheit, (*id.* at ¶¶ 11, 22, #3, 4); (3) this heating denatured the enzymes in the honey, (*id.* at ¶¶ 12, 23, #3, 4); and (4) as a result, the honey was not "raw" (*id.* at ¶¶ 20, 27, #4, 5).

3

Pope further claims Kroger "knew that its labeling of the Raw Honey Products as 'Raw and Unfiltered Honey' was inaccurate, incorrect, deceptive, and misleading[,]" and "[d]espite this knowledge," continued to sell the Raw Honey Products at a premium to the price of non-raw honey. (*Id.* at ¶¶ 21–22, 41, #4, 7–8). For example, Kroger charges almost $1.00 more for the Simple Truth Raw Honey than for Simple Truth Organic Honey. (*Id.* at ¶ 41, #7). In addition, "Kroger either knew, or should have known, and was reckless in not knowing," that its Raw Honey Products were "heated to the point of being cooked" thus "destroying the enzymes that people seek out and expect from the Raw Honey Products." (*Id.* at ¶ 23, #4). Despite supposedly having this knowledge, Kroger took no steps to inform purchasers about the defect or recall the product. (*Id.* at ¶ 25, #5). Instead, Kroger continued to advertise the honey as "raw" honey and deceive consumers. (*Id.* at ¶ 20, #4).

Pope filed a class-action complaint on September 25, 2019. (Compl, Doc. 1, #1–20). In it, she brought six claims against Kroger: (1) violation of the Illinois Consumer Fraud Act ("ICFA"), (2) fraudulent misrepresentation, (3) fraudulent concealment, (4) unjust enrichment, (5) declaratory relief, and (6) injunctive relief. Pope also claims that she has alleged enough facts to meet Federal Rule of Civil Procedure 23's requirements to bring a class action. She defines the putative class as "[a]ll persons and entities in Illinois who made retail purchases of Kroger's Raw Honey products during the applicable limitations period." (*Id.* at ¶ 52, #9).

Kroger responded to the Complaint with a Motion to Dismiss seeking to dismiss the case in its entirety. (Mot. to Dismiss, Doc. 11, #47–105). In support of that

4

motion, Kroger argues that Pope failed to state a plausible claim because her Complaint relies entirely on speculation and guesswork, and that Pope failed to plead her fraud claims with particularity as required by Federal Rule of Civil Procedure 9(b). In her Opposition to the Motion to Dismiss, Pope agreed to drop her fraudulent concealment and injunctive relief claims. (*See* Pl.'s Memo. in Opp'n, Doc. 16, #129 n.12, 133 n.13). Thus, the Court is left to decide Kroger's Motion as to Pope's (1) ICFA, (2) fraudulent misrepresentation, (3) unjust enrichment, and (4) declaratory relief claims. The Court heard oral argument on Kroger's Motion on June 16, 2020.

## LAW AND ANALYSIS

**A.     Standard Of Review.**

It is well-settled law that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). So, to survive a Federal Rule of Civil Procedure 12(b)(6) motion, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555.

In assessing plausibility, the Court must construe the factual allegations in the complaint in the light most favorable to the plaintiff, accepting its allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Wilburn v. United*

5

*States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels and conclusions," because "'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]" *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). "Rule 8 … does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. Thus, in reviewing a motion to dismiss, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be. *See Iqbal*, 556 U.S. at 628 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (alteration and quotation omitted); *see also, e.g.*, *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (finding that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'") (citing *Iqbal*, 556 U.S. at 681); *Miller v. Md. Dep't of Nat. Res.*, No. 18-2253, 2020 WL 3127788, at *4 (4th Cir. June 12, 2020) ("[T]he court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events ….").

Because this case involves allegations of fraud, an additional pleading standard also comes into play. Specifically, when alleging fraud, a plaintiff must comply with Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Solis v.*

6

*Emery Fed. Credit Union*, No. 1:19-cv-387, 2020 WL 2319718, at *3 (S.D. Ohio May 11, 2020).

**B.        Kroger Asserts That Insufficient Testing Was Performed To Make The Complaint Plausible, And Pope Does Not Argue To The Contrary.**

In its Motion to Dismiss, Kroger identifies several proposed shortcomings with Pope's Complaint, including, among other things, that Pope: (1) only speculates that all bottles of Kroger's Raw Honey Products would contain similar HMF values; (2) likewise speculates that Kroger's Raw Honey Products were excessively heated; (3) fails to establish there is a standard for "raw" honey, let alone that Kroger's Raw Honey Products fell below that standard; (4) alleges no facts regarding the enzyme content (as opposed to the HMF value) of the honey she tested; and (5) does not demonstrate how reasonable consumers would be deceived by Kroger's use of the term "raw," nor that there is even a common understanding among consumers of what "raw" means. In light of a concession that Plaintiff made in its briefing, and repeated even more expressly at oral argument, however, the Court need address only one of these grounds—whether testing two bottles of honey provides a sufficient factual basis for a putative class action involving all similarly branded honey that Kroger has sold.

On this issue, Kroger argues the Court should dismiss Pope's Complaint because she improperly speculates that *all* bottles of Kroger's Raw Honey Products contain similar HMF levels based on her testing of only *two* bottles. (*See* Mot. to Dismiss at #64–65). And Kroger may have a point, at least as a factual matter, as this case involves non-processed or "raw" honey. Processed foods would presumably

7

enjoy a great deal of consistency across samples. The contents of one box of Hostess Twinkies, one might suppose, would be almost identical to the contents of another. And the more processed the food is, the more uniform one would expect the product to be across samples. Here, though, while the parties disagree on the exact definition of "raw" honey, they both generally agree that "raw" honey means non-processed (or at least less-processed) honey. Given the lower level of processing, one might expect more variability and less uniformity across the Raw Honey Products. To be sure, the extent of the variability in non-processed foods may differ depending on the characteristic at issue. A given type of apple may have more variability in size than in color among individual apples of that type. And variability may also be reduced when the end product at issue consists of a combination of individual samples (e.g., applesauce vs. apples). Where HMF levels in bottled raw honey falls on the variability spectrum is a question as to which the Court, even applying the full measure of its "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, doesn't have the foggiest notion. And whether that variability matters from a legal perspective is, as discussed below, a different inquiry. But the underlying concern that Kroger identifies—that the HMF measurement the two bottles of Kroger raw honey may not be representative of all other bottles of Kroger raw honey—makes at least some sense.

Where things take an even more interesting turn in is Pope's response. Faced with Kroger's argument on this issue, Pope chooses to mount neither a legal nor a factual defense to her Complaint as written. That is, she does not contend, either in her brief or at oral argument, that her testing of two bottles is sufficient to satisfy the

8

plausibility hurdle for her claims. Instead, she argues that she has now done *more* testing, and that this additional testing provides the needed support. In her brief, for example, her entire response to the small-sample-size argument is this footnote:

> Kroger alleges that the small sample size precludes extrapolating to all Kroger Raw Honey Products. Plaintiff is in the process of having multiple samples of Kroger Raw Honey Products tested. For example, in addition to the two samples pled in the complaint, Plaintiff has additional samples with HMF values of 78 and 79. These samples are appropriate for industrial honey but not [sic] they are not "raw" honey.

(Pl.'s Memo. in Opp'n at #129 n.11). At oral argument, the Court likewise inquired of Pope's counsel regarding the sufficiency of the two-bottle sample. In response, Pope's counsel expressly stated that he agreed that relying on a two-bottle sample was "a little light" to support a federal court complaint, but claimed that this did not matter because more bottles have now been tested.

These concessions leave the Court in a bit of a quandary. As things now stand, it appears that Pope is not defending the Complaint, as written. Rather, she intends to defend the Complaint as supplemented by the additional allegations in her briefing on the Motion to Dismiss. But that is not how Rule 12(b)(6) works. It is designed to test the sufficiency of a complaint, not the sufficiency of a complaint as supplemented by additional briefing.

Had Pope chosen to defend the Complaint, the outcome may well have been different. After all, Pope's own claim is that *she* was harmed. The harm to her, of course, turns on the bottle of honey that *she* bought, not the bottles that other putative class members bought. Thus, at least arguably, the sample on which she conducted testing would be enough to support her own claim.

9

To be sure, whether she has pled enough to move forward on a putative class action may be a separate inquiry. That is, in a putative class action, a plaintiff may be required to plausibly allege both the class allegations as well as the factual allegations relating to the plaintiff's own injury. And on the class front, of course, the similarity between the bottle actually tested and the other bottles sold is important.[2] But case law is decidedly mixed on the question of whether and how the *Twombly/Iqbal* plausibility requirement applies to class issues at the Rule 12 stage. *See, e.g.*, *Ecoquij-Tzep v. Grill*, No. 3:16-CV-00625, 2016 WL 3745685, at *5 (N.D. Tex. July 12, 2016) (collecting cases discussing differing approaches).

In any event, the Court need not address such thorny issues now, as no one has raised them. Rather than arguing that "the Complaint is enough," Pope instead opts to argue that "the Complaint was a little light, but we have more now." So be it. The Court will dismiss Pope's Complaint, but does so without prejudice.

In doing so, however, the Court wants to be clear that it is dismissing the *Complaint*, not the *action*. The difference matters. When a court dismisses an action without prejudice, the party is free to refile, but the relevant statute of limitations date becomes the date on which the new action is filed. By contrast, when a court merely dismisses the complaint and grants leave to amend within a specified time,

---

[2] It may be that the reason Pope does not push the individual-harm issue is that jurisdiction here rests on the Class Action Fairness Act ("CAFA"), which provides federal court jurisdiction only if a putative class action meets the amount-in-controversy requirement of $5,000,000 and describes a class consisting of at least 100 members. 28 U.S.C. §§ 1332(d)(2), (d)(5)(2). The implications of these CAFA requirements for jurisdiction in a case where the named class member overcomes a motion to dismiss merely by showing that his or her own claim is plausible is an interesting issue that has not been raised or briefed, and which the Court need not decide at this juncture.

10

the action remains "on the books" for that specified time, pending the filing of the amended complaint, meaning that the relevant statute of limitations date remains the date of the original action. Given the potential for confusion as between the two, appellate courts have urged district courts to be clear as to which path they are taking.[3] *Ciralsky v. C.I.A.*, 355 F.3d 661, 666–68 (D.C. Cir. 2004) (explaining the difficulties attendant when a district court fails to distinguish between these two possibilities); *see also Hoover v. Timken Co.*, 30 F. App'x 511, 513 (6th Cir. 2002) (differentiating between an order dismissing a complaint and an entire action when determining if the order was appealable).

Here, given that Pope has not previously amended her Complaint, coupled with her assertion that she now has additional factual material buttressing her claims, the Court is not dismissing the entire action, at least not now. Rather, mindful of the admonition in Rule 15(a) that leave to amend should be freely given when justice so requires, the Court instead dismisses the Complaint, and *sua sponte* grants Pope twenty-eight days' leave to file an Amended Complaint that includes allegations relating to testing that she believes will meet the relevant threshold at this stage of the case (and she is free to amend other allegations, as well). If Pope fails to file an Amended Complaint within twenty-eight days, the Court will dismiss the action. Assuming she does file an Amended Complaint, Kroger will, of course, have an

---

[3] Further adding to the confusion, courts sometimes use the rubric of "conditional dismissal" to accomplish this objective. Under that approach, the court "conditionally grants" the motion to dismiss, unless the plaintiff files an amended complaint within a specified period of time. Either way, though, the end result is the same. The court has declared the pending complaint defective, and has provided the plaintiff a specified period of time in which to address the defects. If the plaintiff fails to do so, the action is dismissed.

11

opportunity to challenge the sufficiency of that pleading. In the interest of judicial efficiency, to the extent that any allegations in the Amended Complaint remain unchanged or substantially similar (which seems likely), Kroger may incorporate by reference the arguments in its current briefing, or those made at oral argument.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Kroger's Motion to Dismiss. (Doc. 11). To provide Pope an opportunity to address the shortcomings discussed above, the Court **DISMISSES** Pope's Complaint (Doc. 1) **WITHOUT PREJUDICE** and *sua sponte* grants Pope twenty-eight (28) days' leave to file an Amended Complaint.

**SO ORDERED.**

June 19, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**